Good morning, Your Honor. May it please the Court. I'm Steve Wald. I'm representing the plaintiffs in this appeal. We have a lot of issues to cover and I'm sure we'll get right into them. But I do want to just say that this dispute in Hornish is about landowners on the shores of Lake Sammamish who are very concerned that King County will expand their trail and, in some cases, at least technically, go right into their living rooms according to where the footprint of these homes are in relation to the footprint of the corridor. Is this somewhere in the record? Yes, it is. About the footprint in the home? Yes. Mr. Morell's affidavit was submitted below, Your Honor, and I can give you a cite. That's the one with the rock in the house where there's a separate deed that was given, right? Yes, Your Honor. So you're really talking more about the larger group rather than his specific one, are you not? Well, in Hornish there are six plaintiffs and he also, in his affidavit, mentions that the same kind of footprint issue applies to the other landowners on that trail. And we've also filed a motion to supplement the record with affidavits from another case. Well, let me ask you this, just since you brought this up. As I understand it, in that case there was a discussion with the railroad and a specific deed was given to him to permit him to build a new house, to take the place of the old house, but that also, if you will, established the width of the easement. Is that incorrect? Your Honor, I think the easement itself was established by use over 100 years. And so to the extent that there In the legal description it referred to an edge and it would correspond to the 100-foot claim by the county, right? There are certainly in deeds references to that width, but I think that it's not relevant, Your Honor, because Just another evidence of how wide the easement was, right? No, well, it may be, but I think it's very It may not have been, but it's evidence. I think it's weak evidence. I think the use was the use. You don't like evidence. I don't like that evidence. So I think maybe the place to start beyond this, Your Honor, is with whether the court has jurisdiction over this matter. And we certainly come to you in humility that this wasn't raised earlier. We wish it had been. But the fact of the matter is we didn't perceive this issue until I was there in a courtroom. Let me ask you this. I know you're going to talk about Grable. But I'll ask you as an alternative whether Janux v. U.S. Postal Service provides an alternative basis for our jurisdiction in this case. Your Honor, I don't think it provides an alternative basis. I think the two bases are going to be either federal law creates the cause of action or there's a substantial federal interest pursuant to Grable. I think Janux falls into that framework. And here we certainly have no causes of action that were created by federal law. The Trails Act does not create a federal right of action. I'm interested in why you say that. Here you have a federal act that makes it so that when the railroad does what might result in an abandonment or trigger a reversionary interest under state law, that no longer happens because of the impact of the Trails Act.  How can that not be a federal action if somebody disagrees with what happens? Well, and frankly, Your Honor, that's why we didn't bring it up earlier because that was the mistake we made, is that we thought if we're talking about the Trails Act at all, we're rails-to-trails lawyers, that's our bread and butter, that this is going to be in federal court. And if the case turns on federal law to some extent, it should be in federal court. We think that's the mistake we made, and we think that's the mistake King County is making now. To answer your question, Your Honor, the reason is because maybe the best way to look at this is if you strip away the Trails Act, we could still have the same exact dispute about what are the party's rights in this corridor. Yes and no. If there were no Trails Act, then the state law would follow whatever it was going to do. But this whole thing is about the result of the Trails Act. Your action would never have been brought, right, but for the Trails Act. Well, maybe as a matter of cause and fact in terms of giving King County the thought that it could do certain things with the land. But the fact is, all the Trails Act does is it authorizes trail use now and potential reactivation in the future. By doing so, what it does is it prevents the landowners from having their reversionary rights be triggered. That's why the federal circuit talks about the rights being blocked or forestalled. But the reason that it's a state law issue, Your Honor, is because if you look at Lawson, Washington Supreme Court case, what it says is that a change in rails to trails is beyond the scope of the easement. That's essentially a contractual principle. That's not a common law abandonment principle. It's beyond the scope of the easement, and that triggers an extinguishment of the underlying easement. That is pure state law. And so regardless of whether the reversionary interest is blocked or not, we're not alleging we have a problem with the reversionary interest being blocked. That's all well and good and fine. That's a potential takings case against the federal government. But the state law issue is, what was the width of the prescriptive easement, and does King County have a right to expand that when we get to Caseburg later incidental uses? So really this is just about what in Hornish, what is the width of the corridor? And that's a state law issue. The Trails Act doesn't do anything about that. The Trails Act certainly preserves this corridor, and it does so well. It's going to be preserved now, and it can be used as a trail, and no one is saying there shouldn't be a trail. So if you had your wishes fulfilled at this point, what would you want to happen? What would you want this court to do? Well, since we believe the federal court has no jurisdiction, that's just as officers of the court, we think that's what needs to happen. We should just say, hey, what the district court did below is of no account because it never had subject matter jurisdiction in the first place. Goodbye. See you in state court. Is that right? Yes, Your Honor. So you're saying that the scope of King County's rights under the quick claim deed don't turn on whether the Trails Act creates supplements, replaces preexisting railroad easements? In my mind, it doesn't. All the Trails Act does, where the Trails Act comes in, the wrinkle that the Trails Act gives to this dispute is, it's mostly, frankly, in the Caseberg case, which is, was their underlying railroad easement extinguished? Because trail use is allowed. It's trail use that extinguishes the easement. And that's what federal law foists on the landowners. That's why we have takings claims and that sort of thing. But in terms of the quick claim deed, the railroad can only give what it had. And all it had, in our view, was a prescriptive easement that's much smaller in width than what King County wants to say. And we did offer the affidavit of Mr. Murrell. And so we think if the court should believe it has subject matter jurisdiction, it at a minimum should go back to district court because there's a genuine issue of material fact. I get your point about the prescriptive easement because the railroad had what it had. The county takes the position that it, by virtue of what it has done, has acquired its own prescriptive easement. What I have trouble with on that, though, is they claim that they have paid any taxes. Well, of course, it's the taxing authority. So how can it pay taxes to itself? What's the answer to that? Two things, several things, Your Honor. As to the tax question in Mr. Murrell's affidavit, he says he paid the taxes and he offers documentary evidence. In our motion to supplement the record, we offered affidavits from the neighbor's case, a case where many plaintiffs said, no, we pay the taxes, offer documentary evidence. And King County, by the way, in response to that, withdrew its motion for summary judgment. So I think there's a great question about the veracity of their affidavit to begin with. So as to the tax question, in order to get that statute to apply. Let me just ask you this question. How does he know that he paid taxes on the portion of the whatever it is, easement, fee, whatever? How does he know that? The old records show it. The actual documentary evidence shows the square footage that you can sort of reverse engineer and those affidavits from neighbors explain how that's done. And so it shows like it'll say I don't have the exact number, but it shows a history of paying 7,100 square feet of taxes, which would include the land into the railroad right of way. And now that number has been manipulated somehow in the system to where it's showing 4,600 or whatever it is. And so let's make up for a minute. One of the things that troubled me about this case is nobody put any deeds showing a chain of title. Nobody put any tax records beforehand. And the district court said, hey, how can we find out whether it meets advanced description? You don't put anything in here. There's no evidence that you really have the title that you say you do. Nobody did anything. Now you've got the issue with taxes. But you didn't present this evidence. How can we credit, if you will, information that was not before the district court? Well, first a few things there, Your Honor. Number one, I thought in Hornish, and I'll check the records as I'm on break, I thought we did present chain of title. But also in Mr. Morrell's affidavit, he does say he paid taxes. That was before the district court. As for the neighbor's affidavits, that is very true that the affidavits were not in front of this court. However, I think just as a matter of justice, we would ask the court to accept that to supplement the record. As a matter of justice, we should introduce evidence that should have been presented to the district court and wasn't? Well, I understand your point, Your Honor, but those affidavits are now there and it's on a crucial point and it has to do with the veracity of evidence that King County presented. In any event, it was contraindicated by Mr. Morrell's affidavit, which is in this case, in terms of the taxes. And also on that statute, Your Honor, when we're talking about open and notorious possession, which King County would have to show, yes, for the 12 to 20 feet, they can show that probably, but for the rest of it, they can't. How can they? They'd have to go into the living room. I don't think the trail is in anyone's living room yet. Now, do you take the position that much of your case relies on what I call the Mezno line rule, where it goes to the middle of the track and runs back? Is that much of the heart of your clients' collective claims about what they own? It's certainly a major issue. The center line presumption is. And I know you're very much aware that under Washington law, that if the documents by which your clients obtain their property is in a meets and bounds description that refers to the adjacent property, that that rule does not apply. Yes. And yet, if I understand it correctly, you did not provide evidence of the nature of the legal description, if you will, of your clients' chain of title. If that's right, how can you be the beneficiary of this presumption of land back from the Mezno line on the Eastman? Well, respectfully, Your Honor, I don't think that is right. Okay. Tell me why. We did present our ownership deeds for the plaintiffs. Your current deeds. In this case. Let's start there. I think we also provided the chains for all of the Hornish plaintiffs. Perhaps I'm confusing the cases, but I thought in both cases that the chain of title was not presented. Am I mistaken? I believe so, Your Honor. In Caseburg, four. Only four. Right. That may be what you're thinking of, and I may be wrong. I'll go check. But let's just start with the ownership deeds that were presented. That's where the center line presumption kicks in. And what I mean by that is that if I come to the court and I show that my deed is not in Meats and Bounds, which I think five of the six, that's true in Hornish, don't have Meats and Bounds language, they get the center line presumption. And if you tell me I need to go back and spend a bunch of money to get a chain of title, there's no purpose to the center line presumption. The center line presumption goes away. I'm sorry, Your Honor. I think that where the misreading of the center line presumption comes in, and it was identified in the CFC case of Haggard, is the discussion about the Davises. There were multiple plaintiffs. And when the court talks about the Davises who did not provide their ownership deed, just the kind of circumstance you're talking about, Your Honor, the court gave some language that has been misconstrued that says it's been taken to mean you have to go get a chain of title. And that's not what the court was saying. They were only making the point with those particular owners who didn't get the benefit of the center line presumption that they hadn't presented sufficient evidence. Let me ask you this. We'll make it a hypothetical. Okay. You've got six plaintiffs. You said one clearly does have Meats and Bounds. Let's take the five. Let's just say hypothetically that every deed from which those five people got their title, and, of course, in real estate, that's the way it works. You've got the bundle of rights, and it gets conveyed and conveyed and conveyed and conveyed. Let's say that every one of the predecessor deeds was a Meats and Bounds description, but your current deed is not. What impact, if any, does that have on the availability of the presumption on the median line? Well, it's an evidentiary presumption, and it's a rule of practicality in some respects, I would argue. And so if there is another Meats and Bounds, let me start with this. If you have a lot description, which North Lake, for instance, a Washington case, says you get the benefit of the center line presumption, they call it the highway presumption. At that point in time, the burden then shifts to the defendant to prove that there's something else out there that shows that the grantor reserved the fee. And so it would then become incumbent on the defendant in that case to go find those kinds of deeds. And it's public record. They know how to do a chain of title. But do you? Well, we do, but that's not the issue we're talking about. The issue is the presumption. But it's your burden. And I guess that's what I struggle with. Your case, in part, depends on showing that your clients are entitled to the Mesna line presumption, right? Yes. That's very important to you. Now, you were told by the district court, and I'm asking you the question, if you have predecessor deeds that are based on Meats and Bounds that refer to the edge of an existing easement, if that cuts off that right under Washington law, is that important for you to know and important to rebut that before the court? It can become important in the case, but the way this is structured, and this is true throughout the country, is that I come in with my ownership deed. And if I get the benefit of the presumption, because it's a lot description, and by the way, the Meats and Bounds stuff is a different rule in different states, but in whatever state, I get the benefit of the centerline presumption, that's just a matter of burden of proof, Your Honor. Is a prior Meats and Bounds description important? Sure. But that's not how the rules have been set up. The rules have been set up that now the burden's on them. I've met my burden. Well, let's just say you're wrong, hypothetically. Okay. Only hypothetically. I don't like that, Your Honor. If you're wrong hypothetically, don't you have a big problem? I'm not sure I understand what you mean. In other words, if you do have to show a chain of title, if that's the way you meet your burden and you haven't done it, don't you have a big problem? Sure. If the rule is we have to get a chain and we haven't done it, big problem. Okay. All right. Yes. There's probably lots more you want to talk about, but I mentioned that. Well, if that's okay, I'll reserve the rest of my time. Okay. That's fine. Thank you. Good morning. Good morning, Your Honors. May it please the Court, David Hackett, Senior Deputy Prosecutor for King County, appearing for King County in this matter. Through the rail banking, the Trails Act preserves railroad corridor easements and supplements those with trail rights as a matter of federal law. This case turns on how the Trails Act impacts those existing state easements that in this corridor have existed for about 125 years, defining that corridor and other corridors in the area. Let's first address the issue that your opposing counsel raised, which is, hey, we shouldn't even be here in the first place. The federal courts don't have subject matter jurisdiction. All we're really talking about here is state real property law, and we can just ignore the Trails Act. What is your response to that? I believe, Your Honor, recognized in your questions that there are essentially several ways you get to Article III jurisdiction in this case. First off, the First Amendment complaint has a single cause of action for declaratory judgment, to declare the rights of the parties, not simply the rights of the plaintiffs, but the rights of the parties with respect to the railroad right-of-way at issue. And it specifically asks for a declaratory judgment that King County, quote, only acquired a surface easement for a hiking and biking trail with a possible reactivation of a railroad by and through the Trails Act. They explicitly ask for a federal court to determine the relative rights of the parties under the Trails Act with regard to state law. So it is that situation, both in Rasmussen and in Grable & Sons, where a state law cause of action, quiet title, or in this case, declaratory judgment, turns on an interpretation of federal law. The Trails Act provides an overlay for those state law causes of action. I would submit that under Rule 11, a complaint could not even be filed without taking into account the impact of the Trails Act on those easements. The Trails Act is part and parcel of the property rights that are held by the parties and precisely what plaintiffs ask this court to address. In that sense, I believe the Rasmussen case controls,  the Janicki case is a course of filing. Rasmussen proves that precisely that type of filing is available in this case, and I would submit Rasmussen, as well as Grable & Sons, fully answer the question of federal jurisdiction. Let me ask you a different question. Your opposing counsel also raised this. Of course, each party, and there are six, I believe, in this particular action acquired what we call at law school  had different bundles of rights, and the Trails Act had an effect on what would have normally happened under state law. But some of the rights that were allegedly acquired were of a, if you will, a prescriptive easement. And you know as an experienced lawyer that a prescriptive easement gives to the holder of the easement the right to do what it was doing that created the prescriptive right. So if the railroad acquired it for railroad purposes, that doesn't mean it has the right to do power lines or fly drones or whatever else. It just has the right that it acquired. So if you get from the Trails Act conveyor, which is you basically, a prescriptive right, I've got two questions. Number one, how can you get yourself a prescriptive right? And secondly, how can you convey to any third party something to do differently than what the prescriptive right did? So let's take the first part of this. I would disagree respectfully with the court's interpretation of state law because I think that's what this question turns on. So under Washington law, when the SLS&E built this line back in 1888 and it didn't get permission from the Northern Pacific, which owned the property at the time, it put down its rails. It later was reported in the 1917 VALMAPS and in the 1895 tax assessment records that it had established a 100-foot corridor. So while a normal prescriptive easement between myself and my neighbor might give me very limited rights, what the railroad did in this case and what the record supports, and the focus on the record, of course, is important in this case because it's completely one-sided. What the record supports is that the railroad established a prescriptive easement for a railroad easement, not just any garden variety easement, but the type of exclusive, almost quasi-fee instrument that is recognized under Washington law. Because that railroad easement exists, Washington law further recognizes that any railroad easement, including a deeded railroad purposes easement, allows for incidental use, which are defined by Washington law in the somewhat helpful way, helpful in the sense I'm using it sarcastically, of anything that's consistent with the railroad's purposes. So essentially, we know from the Spokane case that portions of an easement were sold to build warehouses simply so the railroad could derive revenue. That's how broad Washington's incidental use doctrine is. So what you're saying is that under Washington law, that the fact that this was a prescriptive easement, that the original, we'll call it the second railroad, acquired from the first railroad, notwithstanding that it got it for railroad purposes and was only using it to run railroad tracks and incidental things related to that, that under Washington law, incidental uses can be much broader, even though that's not what the prescriptive easement was in the first place. Yes, and I would say the prescriptive easement in the first place and what this record supports is that the railroad established a prescriptive easement for a railroad easement, and every railroad easement would include part and parcel of those incidental uses. And what's your best authority for that? I'll have to defer to my friends in the following case, where we're also a party, which focuses more on incidental use. In this particular case... Can you represent to the court that there is such a case or such a statute? Yes, and what I represent to the court is the facts show that the SLS&E established this corridor, that it was recognized to be 100 feet in 1895, that it was recognized by the ICC through the valve map process in 1917 as a 100-foot corridor, and that it was recognized, particularly in this case, in the 1908 Middleton probate proceedings as a 100-foot corridor. Okay, well, we'll get more information from Kaysburg about that, because that's important. The second thing, then, is there's an allegation, and I believe it's in this case, that the county, to the degree that it didn't receive what you thought you got, it itself has established a prescriptive easement on the balance of the land. And as you well know, one of the requirements to get a prescriptive easement is that you pay the taxes. This is real property taxes, and I believe King County is the taxing authority, right? That is partially the case. If I can back up, the statute actually says that shall also during said time pay all taxes legally assessed. So it's often shorthanded to say pay the taxes, but it's actually pay all taxes legally assessed. Okay, but they're not assessed, no problem. Yeah, if you're exempt, then you meet that requirement in the statute. But importantly, the record also supports, and this was not disputed below, that King County pays, actually pays out of its pocket, surface water fees based on the property. I'd like to just briefly talk about this Morrell Declaration. First off, it's from 1971, so it's before the seven years when King County did pay all taxes legally assessed and surface water fees. But secondly, if you look very carefully at the Morrell legal description under the 1971 real estate statement, it actually says that it excludes the railroad corridor, less railroad corridor. So it's hard to say you're paying taxes on the railroad corridor when your legal description excludes the railroad corridor. And as was mentioned in the opening argument, of course, the Morrells recognized the railroad's 100-foot railroad corridor. That's where that deed, the second deed where they were given the right to build the bigger house, has the reference, right? Actually, two separate things. The deed from the railroad where they got the outer 25 feet of the 100-foot corridor, which resulted in a 50-foot corridor, and then the agreement by Gene Morrell, the current plaintiff himself, recognizing the 50-foot corridor when he got a crossing right from BNSF. That's better than evidence, I would say. That binds Mr. Morrell. I don't know whether this would be in the record, but obviously, as the Morrells case indicates, they had a particular problem. They dealt with the railroad and they reached a deal, basically. Has there been any dealings between any of the six current plaintiffs in the county to provide some kind of a deal that they needed with respect to their particular property, a widening of some kind of protection, anything like that? All the time, Your Honor. But what's in the record are what are called special use permits that have been granted by the county to certain of these plaintiffs for use of the corridor, and that's, of course, inconsistent with the plaintiff's notion that they own part of that corridor. Our primary argument as to why we own part of the corridor is because we got the deed from BNSF to TLC to King County. That described the corridor in great detail. It described the portions like Morrell that had been previously narrowed, and it described the general portions that are 100 feet and in some areas 200 feet. That deed established either in fee, in the case of Hillchuckenham, which was addressed in the Rasmussen case, or in other places, railroad easements, which are what we have for the majority of the plaintiffs in this case. And those railroad easements are what the Trails Act preserved. The Trails Act says that its national policy, quote, to preserve established railroad rights of way for future reactivation of rail service, and quote, to protect all transportation corridors. Now, how does it do this? The mechanism the Trails Act uses is crucial, and the mechanism it uses is to preempt any law or rule of law, and that would include cases like Lawson that determined that trails use extinguishes an easement. That is preempted. It is a rule of law that is preempted by the Trails Act. That mechanism results in the existing state law easement remaining in full force in effect. There are important reasons for that. Number one, we can use it as a trail. We can build all the things that are pertinent to a trail, like drainage, like being able to maintain views and types of things that trail users like to see. But perhaps more importantly, it allows us to preserve the corridor for future reactivation of a railway. If we are in the land that plaintiffs desire, where all state law easements are extinguished and the trail can be 12 feet wide and they can do whatever they want to up to the border of the railroad, BNSF, in its amicus brief, points out that it would be very, very difficult, if not impossible, to reactivate railroads under that situation. It's incumbent, indeed, under federal law, on the trail sponsor to maintain that corridor so that it can be reactivated. Let me ask you this. In connection with incidental uses, and I can't remember whether it's this case or the second case, where there was a right given to some electrical companies, as I recall, and maybe one other, were those approved by the Surface Transportation Board? I will defer to counsel for PSE on that particular question. But typically, I don't believe that they were. It would have to be, would they not, under the Trails Act? I don't believe they would have to be. What the Surface Transportation does is it issues the NITU, which provides the trail right on top of the state law easement, and then it is up to the trail sponsor to maintain that trail and to maintain the easement consistent with Washington law. So under Washington law, once King County or the Port, in that case, owned a railroad easement, they were free to seek incidental uses of that railroad easement. And I think one thing that gets importantly to the Court's question is in every situation where King County has issued an SUP in this case or where the Port issued various rights in the Caseburg case, there is a clause in those contracts that says, essentially, if a railroad wishes to come back, reactivation will occur. In other words, PSE's rights or Sound Transit's rights, or for that matter, King County's rights, are subject to reactivation of that corridor for railroad purposes. It's important that incidental uses be allowed because otherwise property is essentially put in a sealed glass bottle and not allowed for beneficial uses that may be good for future generations. And that's precisely one of the reasons why we preserve railroad corridors is because we find that they're very helpful for things like fiber optic lines, certainly something never thought of. Let's assume, and maybe I misunderstood this, but I thought that either in this case or the other case that at least a portion of the rights conveyed by quitclaim, basically just said the railroad is getting rid of any interest that it has. How then can the railroad reactivate the railroad when it has no right in the underlying property, the fee or otherwise? This particular case is somewhat unique, as I understand it, from other National Trails Act cases and other National Trails Act corridors because King County was not only named the interim trail sponsor by the STB through the need to, but King County also purchased the underlying property. If that's the case then, does that mean that King County is the entity that can reactivate the railroad and not the original railroad? We have already faced a situation, which is cited I believe in counsel's brief, where a small short line tried to reactivate a railroad up near Woodinville. And that went in front of the STB. I think if that reactivation petition had been accepted, certainly it's a federal corridor and the STB could have required King County to enter into appropriate negotiations to lease or sell or rent or whoever knows what to allow the property rights for that railroad to run. But who has that right if a quitclaim deed, of course, means that you give away whatever rights you have in that described property? So if the railroad quitclaimed its interest to King County, it doesn't have anything left, right? So how could it then reactivate a railroad? I think that would be a federal law process before the STB, and I think it's very possible King County could either be required to lease property back to the railroad or to sell property back to the railroad. Kind of a secret, understood part of the deal? I think all parties going into it knowing that the Trails Act, we're subject to the Trails Act just as the homeowners are. And part of the Trails Act is that rail corridors are preserved in federal jurisdiction for the possibility of reactivation. And thus, if a bonafide railroad comes forward and the STB determines that that is appropriate service, that's a case, by the way, that has not arisen yet anywhere in the country, but I have no doubt that the STB would have the authority to do that. Would it have to be the original railroad? Let's just say, for example, that the three of us who all loved Lionel when we were kids, we decided we wanted to do the railroad. So we contact the STB and we say, you know, this is a beautiful place and we think there should be a railroad there. Would we have the right to ask that King County basically allow us to reestablish a railroad without payment of anything? Well, you would have to first off show that you meet the STB's rigorous requirements. We do that. Okay, and if there was a need for it under STB requirements and you had the money, I do believe that, yes, the STB could make that happen. And, in fact, as a side note, in a prior case related to this very corridor, the homeowners tried to start up their own railroad to avoid the trail. So this, as the Ninth Circuit has said, is the long and tortured history of what is known as the Redmond-Issaquah Railroad, and I am proud to be another chapter of that. So for the reasons we've stated in our briefing, the mechanism of the Trails Act is clear. It has that practical purpose of being able to go down to the county courthouse to look at the records to see who owns the easement, to see who owns the property rights. When the reactivation occurs, if your honors have your railroad, you know where to figure out who owns the corridor. That's an important thing you know to go to the STB. One other quick question for you. In the other case for sure, but I want to find out in this, some of the plaintiffs brought claims before the Court of Federal Claims seeking payment for takings of their rights. A lot of money has been awarded in that, which is an obvious recognition that they have some rights that were taken. Was there any claim of that nature in this particular case? Yes. There is a case pending in front of the Federal Court of Claims called the Barras matter, which has been pending for a very long time. Property rights have been argued differently in front of the Court of Claims. State law attorneys have not been there to argue state law doctrines. Certainly, the owner of the property, which is King County, has not been involved in either Haggart or Barras. Recently, as your honors saw in the supplemental authority submitted by King County in Haggart, the federal government has started to make the argument that Washington state law does not have the same type of centerline presumption that you have in other portions of the country. In a Thurston County case, which I believe we submitted, that argument finally carried the day. Just one final question. Would, let's just say hypothetically that in the Barrett case, the Court of Federal Claims concludes that each of the six plaintiffs in this case has suffered some degree of taking and awards them. In the other case, I think it's up to like a million five with interest at this point. They award them a million bucks. Doesn't that speak to their interest, that they had an interest? And if so, how should that impact our analysis? I think what it speaks to is in Barras, the federal government didn't litigate the case very well. What speaks... Those lawyers. You never know. As a county lawyer standing here, I guess I can say that. But in this case, what you do have is a record where plaintiffs have submitted absolutely no chain of title evidence. Roeder from our state Supreme Court tells us that if you fail to do that, you have no centerline presumption. And then secondly, all of their titles are cut off by the 1908 probate deed involving Middleton, as well as Middleton's acquiescence. So they couldn't submit that chain of title. So in this situation, whatever proof they were able to submit to the federal court of claims is absent from this court. And for that reason, we'd ask you to affirm. Other questions, questions by colleagues? Thank you very much for your very helpful comments. Thank you. So, counsel, you've got some rebuttal time. Are you handling the other case, too? I've forgotten. Yes, Your Honor. Okay. Well, we'll look forward to seeing you again. Absolutely. It won't be long. Okay. Just to start, chains of title were, in fact, provided. But where is that in the record? That's in the amended complaint, exhibits to the amended complaint. It's trial docket number 31. Say it again, please. It's trial docket number 31-1. Exhibit A is just an affidavit showing what was attached and all the chains following that. Okay, so basically in this case, you're saying that all of the six plaintiffs provided a chain of title showing the deeds by which they acquired their property. Yes, I haven't gone through and ticked off every plaintiff, but it looked to me like every one was. Okay, that's important. That's important. So you're saying that that was presented? Yes, Your Honor. I just thought I heard counsel say that it wasn't presented. Why are we hearing a different story? I don't know. But I just looked at it. Okay. Okay. I also just want to say on summary judgment, I'm sorry, subject matter jurisdiction, one of the quotes that sticks out to me is the caterpillar quote that says, even if both parties concede that the defense is the only question truly at issue, that's not a basis for arising under federal jurisdiction. So we see a lot of cases where plaintiffs have maybe inartfully pled their cause of action, and there's five in particular. Easton, California Shock, Franchise Tax, Nevada, Phillips Petroleum, and each one of those the plaintiff alleged some violation of federal law or preemption of federal law or a very important, in that case, strong interpretation of federal law. And in each of those cases, all nine circuit of U.S. Supreme Court cases, the courts say, look, if you're really anticipating what actually is just a defense, and in this case the defense is that they have an easement that is still there, and our response to that is, no, you don't, it was extinguished. Well, let me ask you this. I think you raised the idea that because the Trails Act was raised as a defense, it's different. But opposing counsel indicated that in the First Amendment complaint that the invocation of the Trails Act came right out in the first paragraph. Does that make any difference? I don't think it does under these five cases I just mentioned. In fact, what Easton says, a Ninth Circuit case, is that if the plaintiff's claim was properly pleaded, so part of the well-pleaded complaint rule, if we actually look at what the source of the party's rights are and it really just falls under state law, then there's no federal jurisdiction. Wasn't this case a lot like Grable, though? I don't think it is, Your Honor. I think that Grable was not where the plaintiffs were merely anticipating an argument that was going to be made. I think that it is plainly distinguishable in that sense. Other questions? All right, thank you. Do you want to sit down and get a drink of water, or do you want to come right back up? I might just get a couple things real quick. As I understand, by the way, the case just argued is submitted.
judges: M. Smith, Watford, Rayes